# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | Case No. 15-00477-TLM |
| TIMOTHY RESLER and | ) | |
| KIMBERLY RESLER, | ) | |
| | ) | Chapter 7 |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| UNITED STATES TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 15-06062-TLM |
| | ) | |
| TIMOTHY RESLER and | ) | |
| KIMBERLY RESLER, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM OF DECISION

_____

## I.    INTRODUCTION

In this adversary proceeding, the Court must determine whether chapter 7 debtors Timothy and Kimberly Resler ("Debtors") are entitled to discharges of their debts.[1] This Decision constitutes the Court's findings of fact and conclusions

_____

[1]  The parties referred to Debtors as "Tim" and "Kim" and the Court will as well; reference to Debtors and certain others by their first names is not intended to show any disrespect, but is solely for clarity.

MEMORANDUM OF DECISION - 1

of law.  Rule 7052.[2]

Debtors filed a voluntary petition under chapter 7 on April 16, 2015.  On December 21, 2015, the United States Trustee ("UST") timely commenced this adversary proceeding objecting to Debtors' discharges.[3]  The UST alleges:

- Debtors transferred or concealed property within one year before the date of filing their petition, or transferred or concealed property of the estate post-petition, in violation of § 727(a)(2)(A) or (B);

- Debtors knowingly and fraudulently made false oaths in violation of § 727(a)(4)(A); and

- Debtors failed to adequately explain the loss or deficiency of assets in violation of § 727(a)(5).

Adv. Doc. No. 1.

Trial was held from June 6, 2017, to June 8, 2017.  In addition to the ten witnesses[4] who testified at trial, the parties also agreed that certain deposition transcripts would be admitted in lieu of live testimony and could be considered by

---

[2]  Unless otherwise indicated, all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101−1532, references to the "Rules" are to the Federal Rules of Bankruptcy Procedure, and references to the "Civil Rules" are to the Federal Rules of Civil Procedure.  Additionally, "Adv. Doc. No." refers to filings in the instant adversary proceeding, while "Doc. No." refers to those filed in Debtors' bankruptcy, Case No. 15-00477-TLM.

[3]  The Rule 4004(a) deadline to object to entry of discharge was serially extended and a final deadline of December 21, 2015, was established.  Doc. No. 114.

[4]  Those witnesses were: Tim Resler; Kim Resler; Jeff Resler; Paula Hull; Todd Thompson; Ben Helton; Bonnie Schuster; chapter 7 trustee Janine Reynard ("Trustee"); Dennis Charney; and Ryan Jamison.

MEMORANDUM OF DECISION - 2

the Court.[5]  Written closing arguments were delayed at the parties' request until

transcripts of trial testimony were prepared and filed.[6]  Briefing was concluded on

September 18, 2017, and the matter was taken under advisement.  Finally, in

addition to having heard the testimony and subsequently considering the trial

transcripts, exhibits, and depositions, the Court has taken judicial notice of its files

and records as necessary to explain the history of this case, to address certain

procedural aspects, and to place the evidence in appropriate context with events in

the case and adversary proceedings.[7]

## II.   APPLICABLE AUTHORITIES

The UST seeks denial of Debtors' discharges under § 727(a)(2), (4), and

(5).  This Court previously explained:

---

[5]  Those depositions were of Christopher Succa, Patricia Succa, Lorene Hillman, Ken Lee and James Garske.  Exs. 245–248 and 250.

[6]  The trial transcripts, totaling 702 pages, are filed at Adv. Doc. Nos. 71–72.

[7]  As this Court previously explained in *In re Frantz*, 534 B.R. 378, 380, n.4 (Bankr. D. Idaho 2015), judicial notice establishes what was filed and when.  Additionally, certain content can be given evidentiary weight:

> The Court takes judicial notice of its files and records to outline the history of the case and the present disputes. However, as it cautioned counsel at hearing, taking notice of what was filed, and when, does not mean the contents of the filings necessarily have evidentiary weight. *Credit Alliance Corp. v. Idaho Asphalt Supply, Inc. (In re Blumer)*, 95 B.R. 143, 146–47 (9th Cir. BAP 1988); *see also Mora v. Vasquez (In re Mora)*, 199 F.3d 1024, 1026 n.3 (9th Cir.1999) (citing *Blumer* with approval). *But see In re Vee Vinhnee*, 336 B.R. 437, 449 (9th Cir. BAP 2005) (entries on debtor's verified bankruptcy schedules and statements, when offered against debtor, have evidentiary effect under Fed. R. Evid. 801(d)); *Jordan v. Kroneberger (In re Jordan)*, 392 B.R. 428, 444 n. 32 (Bankr. D. Idaho 2008) (same).

MEMORANDUM OF DECISION - 3

> Discharge exceptions "should be strictly construed in order to
> serve the Bankruptcy Act's purpose of giving debtors a fresh start."
> *Caneva v. Sun Communities Operating Ltd. P'ship (In re Caneva)*,
> 550 F.3d 755, 761 (9th Cir. 2008). As stated in *Ditto v. McCurdy*,
> 510 F.3d 1070, 1079 (9th Cir. 2007), "[A] total bar to discharge is an
> extreme penalty." "The reasons for denial of a discharge must be
> real and substantial rather than technical and conjectural[.]" 6
> Collier on Bankruptcy ¶ 727.01[4], 727–12 (Alan N. Resnick &
> Henry J. Sommer, eds., 16th ed 2010). But notwithstanding these
> cautions, the burden of proof in § 727(a) litigation is a
> preponderance of the evidence. *Retz v. Samson (In re Retz)*, 606
> F.3d 1189, 1196 (9th Cir. 2010).

*In re Clark*, 525 B.R. 442, 457 (Bankr. D. Idaho 2015).

## A.    Section 727(a)(2)

Sections 727(a)(2)(A) and (B) address the transfer or concealment of a

debtor's assets pre-petition, and/or of property of the estate post-petition, with the

intent to hinder, delay or defraud either creditors or "an officer of the estate

charged with custody of property under this title" (*i.e.*, Trustee). To obtain denial

of Debtors' discharges under § 727(a)(2)(A) or (B), the UST must show (1) the

disposition of property by transfer, removal, destruction or mutilation, or the

concealment of such property, and (2) that a debtor doing so acted with actual

intent to hinder, delay, or defraud a creditor or the trustee. *Petro Concepts, Inc. v.*

*Mundt (In re Mundt)*, 2009 WL 5386131, at *15 (Bankr. D. Idaho Dec. 9, 2009).

This provision requires actual, not constructive, intent despite the fact that its

language does not include the word "actual." *Devers v. Bank of Sheridan, Mont.*

*(In re Devers)*, 759 F.2d 751, 753 (9th Cir. 1985). A plain reading of the statutory

MEMORANDUM OF DECISION - 4

language reveals that the required intent to "hinder, delay, or defraud" is stated in the disjunctive, so an actual intent to hinder, or to delay, is sufficient. *See Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1281 (9th Cir. 1996). Additionally, courts may infer the requisite intent from all the facts and circumstances of a case, because a debtor is unlikely to testify directly that his intent was improper. *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1343 (9th Cir. 1986); *Devers*, 759 F.2d at 753–54. Thus, intent may be established by circumstantial evidence, or by inferences drawn from a course of conduct. *U.S. Trustee v. Snodgrass (In re Snodgrass)*, 359 B.R. 278, 288 (Bankr. D. Idaho 2007).

###### B.    Section 727(a)(4)

Section 727(a)(4)(A) operates to deny a discharge to a debtor who "knowingly and fraudulently" makes a false oath or account in the course of a bankruptcy case. "The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to conduct costly investigations." *Fogal Legware of Switz., Inc. v. Wills (In re Wills)*, 243 B.R. 58, 63 (9th Cir. BAP 1999) (*citing Aubrey v. Thomas (In re Aubrey)*, 111 B.R. 268, 274 (9th Cir. BAP 1990)). To prevail on a § 727(a)(4)(A) claim the UST must show, by a preponderance of the evidence, that: "(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently." *Retz,* 606 F.3d at 1197 (*quoting Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (9th Cir. BAP

MEMORANDUM OF DECISION - 5

2005)).

"A false statement or an omission in the debtor's bankruptcy schedules or statement of financial affairs can constitute a false oath." *In re Retz*, 606 F.3d at 1196 (quoting *Khalil v. Developers Sur. & Indem. Co. (In re Khalil)*, 379 B.R. 163, 172 (9th Cir. BAP 2007), *aff'd* 578 F.3d 1167, 1168 (9th Cir. 2009) (adopting the BAP's statement of applicable law)).  "A fact is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property.  An omission or misstatement that detrimentally affects administration of the estate is material."  *Retz*, 606 F.3d at 1198 (quoting *Khalil*, 379 B.R. at 173, and *Wills*, 243 B.R. at 63).  However: "The recalcitrant debtor may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted or falsely stated information concerned a worthless relationship or holding; such a defense is specious." *Murphy v. Vanschoiack (In re Vanschoiack)*, 356 B.R. 56, 64 (Bankr. D. Idaho 2006) (quoting *Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 618 (11th Cir. 1984)).  And, "[t]he asset's value need not be 'material,' nor must a debtor 'succeed in harming creditors to warrant denial of discharge.'" *Id.* (citing *Bernard*, 96 F.3d at 1281–82).  *See also Wills*, 243 B.R. at 63 ("A false statement or omission may be material even if it does not cause direct financial prejudice to creditors.").

Section 727(a)(4)(A) requires a false oath be made knowingly.  A debtor

acts knowingly in making a false oath "if he or she acts deliberately and

consciously." *Retz*, 606 F.3d at 1198 (quoting *Roberts*, 331 B.R. at 883–84).  The

Court must also find that the false oath was made fraudulently.  *Id.*  To

demonstrate fraudulent intent, the UST must show that the false oath was made

with the intention and purpose of deceiving the creditors or trustee—that is, the

UST must show actual intent.  *Id.* at 1198–99.  Actual fraudulent intent is usually

proven by circumstantial evidence, including inferences drawn from a debtor's

conduct.  *Id.*[8]

## III.  DISCUSSION AND DISPOSITION

For clarity of exposition, the discussion of the evidence and the application

of authorities to the same are taken on a subject matter basis.

### A.  The "Ring"

#### 1.  Facts

Debtors have been married for 29 years.  At the time of the petition, they

lived in a large home and estate located at 757 South Moon Beam in Eagle, Idaho

(the "Residence").  The Residence is located on property adjoining a 40 acre lake.

In addition to the main house, there is a large garage with a guest house.  The

Residence includes significant landscaping, pools and spas, a private beach area,

---

[8]  Given the conclusions reached *infra*, the Court concludes it need not outline the
authorities relevant to § 727(a)(5).

MEMORANDUM OF DECISION - 7

and a dock into the lake.[9]

Tim generates virtually all income for the family and manages all of the businesses and household finances.[10]  Kim was a stay-at-home mother while their son, Jeff, was younger.  As of the petition date, she generated $1,200 per month in income by providing cleaning services.[11]  Kim's role in regard to the family finances is minimal and essentially limited to making bank deposits and issuing checks at Tim's request.  However, Kim had full access to family accounts and the ability to spend freely, even though Debtors would generally discuss purchases in excess of $10,000.

In 2001, Tim purchased a $31,000 diamond and platinum ring (the "Ring") for Kim as a replacement for her original wedding ring.[12]  In 2007, Kim worked with a jeweler to do a customized rebuilding of the Ring at an additional cost of $4,510.[13]  According to Tim, Kim loved the Ring and wore it every day unless it was being repaired.

---

[9]  *See* Ex. 253 (Google map photo).  At the time of filing, Debtors scheduled the Residence as having a value of $1,422,594.94 but securing $2,166,000 of claims.  They also disclosed that title was held in the name of the Resler Trust.  Ex. 113 at 10.  Debtors' motion to compel abandonment of the over-encumbered Residence was granted in July 2015.  Doc. No. 50.  By stipulation, the interests in the Resler Trust were abandoned.  Doc. Nos. 102–104.

[10]  Ex. 113 at 48 (schedule I, identifying Tim as a self-employed executive/consultant with $19,000 in monthly gross income).

[11]  Ex. 113 at 48.

[12]  Ex. 147 at 5.

[13]  Ex. 147 at 4.

MEMORANDUM OF DECISION - 8

In June 2010, the Ring was appraised in order to have it added to Debtors' homeowner's insurance policy.  That appraisal established a value of $46,295.[14] Using the appraisal, Kim obtained a rider to Debtors' homeowner's insurance policy, effective July 2010, insuring the Ring in that amount.[15]

Debtors initial bankruptcy schedules listed several items of jewelry with a total value of $9,250.[16]  On April 21, 2015, the UST sent Debtors' counsel a letter requesting additional information and documentation including copies of insurance policies with any jewelry riders.  The following day, Debtors amended their schedule B to add a "Ladies platinum and diamond band" valued at $2,000.[17]  On May 8, 2015, in response to the UST's request, Debtors provided the UST a copy of their homeowner's insurance policy, which included a rider for a ladies platinum and diamond ring insured for $46,295.[18]  However, a notation on the rider in Tim's handwriting stated "Paula / Kim Moms ring paula has" [*sic*] and "she

---

[14]  Ex. 149.

[15]  Ex. 150 at 4.

[16]  Ex. 113 at 11.  Debtors' were asked how they created the list of jewelry in their schedule B.  They explained Kim collected all jewelry from her jewelry box and Tim's drawer, put it in a pile, and listed what she found.  Using that approach, Debtors listed a $5,000 Rolex watch, a $2,500 woman's wedding ring, other watches valued at $1,000, a man's wedding ring worth $500, and miscellaneous costume jewelry valued at $250.

[17]  Ex. 118 at 4.

[18]  Exs. 120, 122.

MEMORANDUM OF DECISION - 9

paid us for insuring it while she lived with us."[19]

On May 22, 2015, during Debtors' § 341(a) meeting, Kim was asked about the $46,295 ring listed on the insurance policy. Kim testified that the reference was to a ring belonging to her sister, Paula Hull ("Paula"), and that Paula's ring was insured on the Debtors' policy because Paula was living with them.[20]

A year later, in discovery responses, Debtors acknowledged the ring listed on the policy rider was not "Paula's ring" but instead referred to Kim's Ring that had been valued at $46,295.[21] However, Debtors asserted the Ring was no longer in their possession because Kim had thrown it into the lake behind their Residence following marital troubles and a fight, it was never recovered, and thus they had no interest in the Ring at the time of the petition.[22] The discovery responses also asserted that Kim's testimony at the May 2015 § 341(a) meeting about the $46,000

---

[19] Ex. 122 at 7.

[20] Ex. 231 at 78–79. Debtors explained that in June 2012, Paula had gone through a divorce, was having financial difficulties, and began living in Debtors' guest house, which continued until January 2015. Kim and Paula both testified that in the latter part of 2012 Paula, given her financial circumstances, was contemplating selling a wedding ring that she had inherited from their mother ("Paula's ring"). Kim, wanting Paula's ring to stay in the family because of its sentimental value, offered to purchase it from Paula. According to Kim and Paula, they agreed to value Paula's ring at $25,000 (based upon sentimental value alone, since Paula's ring had not been appraised), and that Kim would make payments of $1,000/month ($250/week) until the ring was paid for in full. If Kim quit making payments, all sums paid to Paula would be forfeited. Kim made payments of approximately $11,000. However, when she determined she could no longer afford to make the payments, Kim returned Paula's ring to Paula and forfeited the $11,000. Thereafter a second agreement between Kim and Paula was signed on March 3, 2016, under which the ring was again sold to Kim for $25,000 with $250 payments required monthly rather than weekly. Ex. 137.

[21] Ex. 228 at 7.

[22] *Id*.

MEMORANDUM OF DECISION - 10

ring was mistaken because she assumed the questions referred to Paula's ring. They also stated that, when questioned, Kim "did not remember the $46,000 [R]ing that had previously been thrown in the lake."[23]

At trial, Kim elaborated upon the circumstances that led her to throw the Ring in the lake. Kim testified that she discovered in December 2014 that Tim had been having an affair. This created marital tension that culminated on February 14, 2015—Valentine's Day—when Kim removed the Ring that reminded her of Tim's infidelity and threw it into the lake behind the Residence. Tim testified that Debtors believed the Ring was "cursed." He was not upset that Kim threw it in the lake because he understood her feelings.

At trial, Ryan Jamison ("Jamison"), a scuba diver who also does underwater search and salvage, testified that Tim contacted him in May of 2016 to discuss searching for the Ring in the lake behind the Residence. Jamison agreed to do so. However, Tim then told Jamison that he had been advised to postpone searching for the Ring.[24]

On June 3, 2016, Tim ordered a replica of the Ring to be made by the same jeweler who rebuilt the Ring. The replica cost $9,000, reflecting the fact that the main stone was a cubic zirconia rather than a natural diamond. Kim had not expressed a desire to have a replica, but Tim stated he ordered the replica as a

---

[23]  *Id*. at 8.

[24]  Who so advised Tim was not made clear.

surprise for Kim's 50th birthday, believing she would appreciate the gift because she was so fond of the Ring and he thought the new ring would symbolize a new start for Debtors' marriage.[25]

It was only in May 2017, shortly before trial, that Tim once again contacted Jamison and hired him to search for the Ring. On May 31, 2017, Jamison and his brother met at the Residence and together searched the lake. Initially, Jamison was unable to locate the Ring. He then asked Kim to throw rocks into the lake so he could judge her throwing range. After that exercise, Jamison moved closer to shore and, ultimately, located the Ring.[26] Upon exiting the water, he gave the ring to Debtors' attorney, who was present during the search. Debtors' attorney then contacted the UST and Trustee to notify them about the recovery of the Ring. The

---

[25]   Debtors implied that the creation by Tim of a duplicate ring in 2016 was evidence that the Ring was gone. On the whole of the evidence, the Court finds the creation of the duplicate ring is not compelling, much less conclusive, as to the loss of the Ring, nor indisputable corroboration of Debtors' testimony.

[26]   The Court found Jamison to be credible and does not question that he recovered the Ring from the lake in May 2017. However neither his testimony nor other evidence establishes with any certainty how long the Ring was in the lake prior to its recovery. Debtors argue in briefing that Todd Thompson, the jeweler who made the Ring, in testimony following his inspection of the Ring, confirmed "that it's [sic] condition was consistent with spending a long amount of time at the bottom of the lake." Adv. Doc. No. 78 at 6. This is not entirely accurate. What Thompson did say was that platinum is anti-corrosive, and that it could be readily cleaned. When asked if the Ring was in a condition consistent with being in the water for two years, he agreed "depending on how well it was cleaned up once it came out of the lake." On cross-examination Thompson was asked: "And do you think you would be able to distinguish how a ring looked that had been submerged for six months as opposed to a year?" He replied: "I don't know if I could give you a definitive time frame saying this ring was in the water for six months or this one was in for a year, unfortunately." Adv. Doc. No. 71 at 443–46.

MEMORANDUM OF DECISION - 12

Ring was delivered to the Trustee at trial.[27]

## 2.    Analysis and disposition

The UST's § 727(a)(2) cause of action requires the Court to determine whether (1) Debtors concealed the Ring and (2) whether such concealment was done with actual intent to hinder, delay, or defraud a creditor or the trustee.  And, under § 727(a)(4), the Court must determine whether Debtors knowingly and fraudulently made material false oaths about the Ring.

For purposes of this opinion, the Court focuses on the defense that the Ring was tossed in the lake on February 14, 2015, and Debtors forgot to mention anything about it in their April 16, 2015 bankruptcy filings or their subsequent filings.  There are, of course, two possible scenarios.  One is that the Ring was thrown into the lake in February 2015.  The other is that the Ring was concealed, but not thrown into the lake until some later point in time, where it was recovered on the eve of trial by Jamison.  But the Court finds that, under either scenario, there was concealment.

There is no evidence conclusively establishing when the Ring entered the lake.  However, even if it was thrown into the water in February 2015, Debtors were certainly aware of it when discussing a filing and meeting with counsel just weeks after the event.  This event, and the marital discord that fomented it, was significant and dramatic.  The Ring was obviously very valuable and personally

---

[27]    Trustee later sold the Ring at auction and recovered $22,055.00.  Doc. No. 159.

MEMORANDUM OF DECISION - 13

symbolic.  Debtors knew the Ring might be recovered and briefly considered that course of action.  But Debtors did not disclose anything regarding the situation in their filings or to Trustee.

Kim explained that their scheduled jewelry list omitted the Ring because they no longer had the Ring at the time they prepared that list.  This suggests their manner of scheduling was the result of a conscious decision not to include the Ring because it was "gone."  Even crediting Debtors' testimony that the Ring was "gone," it still existed, and was Debtors' property on the date of filing, despite Debtors allegedly not having immediate physical possession of it.  There was no impediment to listing the Ring as property of the estate and explaining the circumstances of its location, *i.e.*, that it was "in the lake behind our house at 757 S. Moon Beam, Eagle, ID."  *See*, *e.g.*, sched. B (allowing debtors to provide both "Description *and Location* of Property").  Why they did not do so was not adequately explained.

And if Debtors truly believed the Ring irretrievably gone, they did not disclose or explain on their statement of financial affairs ("SOFA") the loss of this valuable asset mere weeks before filing.  Tim said, referring to the SOFA's language, this was because the Ring's loss was not one resulting from fire, theft, other casualty, or gambling.  He testified, though, that he knew the Ring was in the lake, that Kim had thrown it there, and that it could be retrieved.  However hypertechnically Debtors wished to read SOFA question no. 8, it is undoubtedly

MEMORANDUM OF DECISION - 14

clear that they *could* have disclosed the "loss" of the Ring, provided its "description and value" and a "description of circumstances [of loss]" and the "date of loss." They did not.

Inconsistent with her other explanation, Kim stated that Debtors' failure to disclose the Ring in their schedules and SOFA was simply inadvertent, and the result of their forgetting about the Ring thrown in the lake because it was not in the pile of jewelry Kim collected and used when listing their jewelry in their schedules.

Context matters in determining Debtors' states of mind when failing to disclose the Ring. Tim first met with potential bankruptcy counsel in the fall of 2014.[28] Debtors thereafter met with the bankruptcy attorney who represents them in this case on or about February 23, 2015, just nine days after the Ring was purportedly thrown in the lake.[29] Given the dramatic disposal of the Ring, the Ring's value (both monetary and sentimental), and the fact that the event occurred a little over one week prior to meeting with bankruptcy counsel and less than two months before bankruptcy, Kim's explanation of such a short memory is difficult

---

[28]  Adv. Doc. No. 71 at 206–210. After stating at trial that he first considered filing for bankruptcy, and first consulted bankruptcy counsel, only about three weeks before the April 2015 filing, Tim was impeached with his deposition which established he met with an attorney (though not the one eventually retained for filing) some seven months before filing. Tim admitted he talked to that lawyer in the fall of 2014 in part to learn more about bankruptcy, but he argued he was then focused on issues with several creditors related to a business entity.

[29]  Ex. 114 (Rule 2016(b) disclosure with counsel's Feb. 23, 2015 engagement letter later signed by Debtors); *see also* Adv. Doc. No. 71 at 303–04 (Kim's testimony about discussing bankruptcy with Tim two weeks before meeting with the attorney).

MEMORANDUM OF DECISION - 15

to accept.

The question of concealment is not limited solely to Debtors' failure to disclose assets initially in their schedules and SOFA. Debtors' subsequent conduct in response to inquiry about the Ring is relevant.

On April 21, 2015, the UST sent a letter seeking copies of homeowner's insurance policies including jewelry riders from Debtors. The next day, Debtors amended their schedules to include a "platinum and diamond" wedding band, but one valued at only $2,000.[30] Debtors then provided a copy of an insurance rider showing a ring valued at over $46,000. At no time during these inquiries did Debtors disclose Kim's $46,000 platinum and diamond Ring, nor did they advise that she had thrown that Ring into the lake in a fit of anger shortly before bankruptcy. Instead, upon questioning by Trustee, Debtors claimed this was "Paula's ring" and did not identify or address Kim's Ring. This assertion about the insured ring being Paula's was made under oath at their May 22, 2015 meeting of creditors. Debtors now claim that they were simply confused at the meeting of creditors, arguably because they had not had an opportunity to review the insurance rider for clarity. Debtors' professed confusion regarding the ring listed on their insurance policy with a $46,000 value is not persuasive.[31]

---

[30] Exs. 117, 118.

[31] Tim did acknowledge at trial that the information Debtors provided to the UST and his hand-written notation on the insurance policy rider about the insured ring being Paula's, were not accurate. Adv. Doc. No. 71 at 223–226

MEMORANDUM OF DECISION - 16

After careful consideration of the entirety of the evidentiary record and—importantly—the evaluation of the credibility of Tim and Kim, the Court finds Debtors concealed the Ring. Debtors failed to list the Ring in their schedules and SOFA. They continued to conceal the Ring when specifically questioned by Trustee about the $46,295 ring listed on Debtors' homeowner's insurance policy by explaining that the ring listed belonged to Paula. The Court further finds that both Tim and Kim concealed the Ring with the intent to hinder, delay, or defraud Trustee. The UST met its burden of showing that Debtors' discharges should be denied pursuant to § 727(a)(2).

The evidence further leads the Court to find that Debtors made false oaths regarding the Ring—both by failing to disclose the Ring in their schedules and SOFA and by misstating on multiple occasions that the rider on their homeowner's insurance policy referred to Paula's ring. These false oaths were material, as they related to property of the estate and detrimentally affected Trustee's ability to administer the estate. Further, the Court finds Debtors knew the oaths were false and were not the result of inadvertent omissions. Rather, Debtors' false oaths were done with the requisite intent to prevent Trustee from discovering the existence of the Ring. The UST met its burden of showing that Tim's and Kim's discharges should be denied pursuant § 727(a)(4).

MEMORANDUM OF DECISION - 17

### B.      High Valley Cabin

#### 1.      Facts

Tim's attorney, Dennis Charney ("Charney"), had purchased a cabin located at 54 Ranch Circle in High Valley, Idaho ("High Valley Cabin") from James Garske ("Garske").  Garske had a mortgage with Wells Fargo secured by the High Valley Cabin, which was serviced with the funds Charney paid to Garske. In April 2014, Tim began discussions with Charney about purchasing the High Valley Cabin.[32]

The agreement ultimately reached in 2014 listed Tim and Kim as "buyers" and Charney as "seller."[33]  The parties agreed to a purchase price of $225,000 and Debtors were to make $1,500 per month "lease" payments to Charney, several large "annual interest payments," and a $35,000 balloon payment after 36 months (this last payment was to be used to pay the remaining balance of Garske's Wells Fargo loan).  The agreement provided that "[u]ntil such time as the Wells Fargo note is paid this agreement shall constitute a lease."[34]

Despite listing Tim and Kim as the buyers, the agreement was signed by Tim and *Jeff* on April 21, 2014.[35]  Then, on May 22, 2014, Charney emailed the homeowners' association for the High Valley Cabin regarding the "new owners at

---

[32]  Ex. 190.

[33]  Exs. 194, 195.

[34]  Ex. 195 at ¶8.

[35]  Ex. 195 at 2.  This exhibit does not contain Charney's signature.

MEMORANDUM OF DECISION - 18

54 Ranch Circle" and he provided Debtors' contact information to the development's homeowners' association ("HOA").[36]  Shortly thereafter, the HOA sent an email to the various owners notifying them of an upcoming meeting.  In response, Tim explained to the HOA that he would try to attend the meeting but Kim would not be able to attend; Tim did not mention Jeff.[37]

On October 27, 2014, Jeff signed another lease/purchase agreement for the High Valley Cabin.  Ex. 201.[38]  This second agreement is identical to the agreement signed by Tim and Jeff in April 2014, except that it lists Jeff alone as the "buyer" rather than Tim and Kim.[39]

When filing their bankruptcy petition in April 2015, Debtors did not list the High Valley Cabin, or any interest therein, on their schedules.  During their meeting of creditors, Debtors were specifically asked about any interests in real property they had in the prior 10 years.  They made no mention of the High Valley

---

[36]  Ex. 197.

[37]  Ex. 198.

[38]  Recall, Debtors first met with counsel and discussed bankruptcy in the fall of 2014. *See supra* note 28.

[39]  This second agreement signed by Jeff is dated April 21, 2014, but Jeff and Charney both testified that the date was a typographical error.  Using the original agreement, Charney changed the name of the "buyer" to Jeff, but failed to change the date of the agreement.  Adv. Doc. No. 72 at 632.  The second agreement was actually signed on or about October 27, 2014. *Id*. at 631–32.  It is not clear from the record whether the first agreement signed by Tim and Jeff was actually terminated.  Tim, Jeff, and Charney all claim that Tim was released from the agreement, but the Court was provided with nothing to substantiate this claim.  The parties appear to assert that the execution of the second agreement automatically terminated the agreement signed by Tim.  For purposes of assessing Tim's intent, the Court will assume, without finding, that the agreement was terminated when Jeff signed the second agreement.  It is clear the parties believed such was the case and Tim's intent was based upon such belief.

MEMORANDUM OF DECISION - 19

Cabin.[40]  However, at a minimum, Tim had a putative lessee interest, and a "purchase" right in the year prior to filing.

The UST eventually became aware of the High Valley Cabin through legal counsel for Idaho Trust Bank and began making specific inquiries regarding Debtors' interest.  As part of the process, the UST indicated an intent to subpoena the HOA.  In order to avoid the HOA being surprised by this request, Tim sent an email notifying the HOA that it would be receiving a subpoena for records and emails related to Debtors.  In that email, Tim explained that "Dennis Charney agreed to cancel our lease prior to our [bankruptcy] filing and my son Jeff wanted to start a new one with him[.]"  Tim told the HOA he had forgotten to forward Jeff's contact information to it earlier, and he provided Jeff's email address.[41]

### 2.    Analysis and disposition

The UST claims Debtors knowingly and fraudulently concealed the transfer of, and knowingly and fraudulently made material false oaths regarding, their interests in the High Valley Cabin.  It is undisputed that both Debtors had knowledge of —at a minimum—a lease interest in the High Valley Cabin and failed to schedule such interest or disclose on the SOFA the transfer of such interest.  It is also undisputed that Debtors failed to disclose the prior interest or its transfer when questioned at their § 341(a) meeting.  The question is whether

---

[40]  Ex. 231 at 61–71.

[41]  Ex. 205.

MEMORANDUM OF DECISION - 20

Debtors' conduct was done with fraudulent intent.

Debtors claim they had no fraudulent intent.  Rather, Debtors claim they had only leased the High Valley Cabin and did not believe a lease was an interest that required disclosure—either in Debtors' initial schedules and SOFA or thereafter.

While the agreement with Charney provided that it would remain a lease for a period of time,[42] the purchase provisions of the agreement undermine Debtors' claim that it was solely a lease.  The agreement is a lease and purchase agreement listing Tim and Kim as "buyers" and Charney as "seller" of the High Valley Cabin.  Its terms provided for a $225,000 purchase price, and required $1,500 monthly payments plus a $35,000 balloon payment.  Debtors' claim that they "only" had a lease interest in the High Valley Cabin is not credible.  Moreover, even a mere lease interest was within Trustee's questioning about "any interest" Debtors had in real property over the preceding ten years.

At trial, Tim stated that, at the time Debtors filed their petition, they no longer had any interest in the High Valley Cabin and, therefore, there was nothing to disclose.  Tim testified he determined Debtors could not afford the High Valley Cabin, and Charney agreed to terminate the agreement.  Jeff then signed a new agreement with identical terms except Tim and Kim were not parties.  Thus, even

---

[42]   As explained above, the agreement provided it would be a lease until the Wells Fargo note was paid. Ex. 195 at ¶ 8. At the time Tim purports that the agreement with Charney was terminated, the Wells Fargo note had not been paid and, Debtors contend it remained a lease.

MEMORANDUM OF DECISION - 21

in Tim's version, the joint interest in the cabin was transferred back to Charney about six months before bankruptcy.  Tim knew this transfer occurred.  And he knew when it occurred.  The email to the HOA, Ex. 205, adequately reflects this.

However, contrary to Debtors' claim that they could no longer afford the High Valley Cabin and simply desired to be released from their obligation under the lease, the record indicates a transfer of Debtors' interest in the High Valley Cabin was contemplated even prior to entering into the original April 21, 2014 agreement signed by Tim and Jeff.  On April 17, Charney suggested Tim move forward with signing the lease/purchase agreement and that Jeff or a corporation could purchase the High Valley Cabin in the future in order to "keep it under the radar," referring to shielding the High Valley Cabin from Debtors' creditors.  Tim responded "[y]ou are right on.  Lets [*sic*] write it up."[43]

Debtors were asked at their § 341 meeting about a check in the amount of $111 for the purchase of a light for a cabin.  In response, Debtors testified under oath that they were confused about the check and that they would not have purchased a light in Idaho and shipped it to a different cabin in California, which Tim admitted to holding through an LLC.[44]  Kim said "I don't know why I put cabin there either" and Tim later responded "[w]e only have one cabin, so," and

---

[43]   Ex. 191 at 5.

[44]   That cabin is the subject of another count in the complaint, but it need not be reached in this Decision.

MEMORANDUM OF DECISION - 22

laughed.[45]  Again, Debtors had the opportunity to disclose their interest in, or

transfer of, the High Valley Cabin, but they failed to do so.  Trustee only learned

about Debtors' interest in the High Valley Cabin several months later when she

was contacted by legal counsel for Idaho Trust Bank.  Adv. Doc. No. 72 at 595.

At trial, Kim admitted she was aware of the High Valley Cabin at the time of

Debtors' § 341 meeting and that the light was purchased for the High Valley

Cabin.  However, she claimed that she purchased the light "for Jeff."[46]

Debtors attempt to finesse the requirements of schedule and SOFA

disclosures by focusing on the nature of the interest as a mere lease.  Their

interpretations are strained, and their justifications for nondisclosure are

unpersuasive.  Debtors' knowledge of the existence and subsequent transfer of

their lease/purchase interest shortly before bankruptcy, the financial circumstances

then existing, and the incomplete and evasive responses to inquiries at their § 341

meetings, support a finding that Debtors' concealment of the High Valley Cabin

and its transfer was done with intent to hinder, delay, and frustrate Trustee's

administration of the estate, and that Debtors' false oaths were made knowingly

and fraudulently.

It would have been far easier, as well as more forthright, for Debtors to

have simply explained the interest in the High Valley Cabin, their transactions

---

[45]  Ex. 235 at 55.

[46]  Adv. Doc. No. 72 at 490.

MEMORANDUM OF DECISION - 23

with Charney, and their surrender of their interest in favor of Jeff's sole interest six months before filing. More importantly, it was required. The UST has met its burden of showing Debtors' discharges should be denied pursuant to § 727(a)(2) and (a)(4) as a result of concealment of, and false oaths made in connection with, interests in the High Valley Cabin.

**CONCLUSION**

Bankruptcy debtors are required to make full and complete disclosure of all assets and liabilities at the time of filing and transactions and events regarding their assets for a significant period prior to filing. *See* § 521; Fed. R. Bankr. P. 1007(b). The function of the requirement of full and complete disclosure is to ensure accurate and dependable information is provided to the Court, trustee, and creditors upon which they can rely without the need for additional inquiry. *Aubrey v. Thomas (In re Aubrey)*, 111 B.R. 268, 274 (9th Cir. BAP 1990). It is not for debtors to elect what to disclose; all property and interests in property must be disclosed, even if debtors believe the assets are worthless or unavailable to the estate. *Palmer v. Downey (In re Downey)*, 242 B.R. 5, 12–13 (Bankr. D. Idaho 1999) (citing, *Matter of Yonikus*, 974 F.2d 901, 904 (7th Cir. 1992)).

Despite Debtors' attempts to explain the omissions and false oaths regarding the Ring and High Valley Cabin, the Court is persuaded by a preponderance of the evidence that Debtors' discharges should be denied pursuant to § 727(a)(2) and (a)(4).

MEMORANDUM OF DECISION - 24

By virtue of these rulings, the Court finds it unnecessary to address the other remaining counts asserted by the UST.

The UST may submit a form of order and judgment in accord with this Decision.

DATED:  January 5, 2018

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 25